# Illinois Official Reports

## Appellate Court

---

### *Berry v. City of Chicago*, 2019 IL App (1st) 180871

---

| | |
|---|---|
| Appellate Court Caption | GORDON BERRY and ILYA PEYSIN, Plaintiffs-Appellants, v. THE CITY OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-18-0871 |
| Filed | May 22, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CH-02292; the Hon. Raymond W. Mitchell, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Elizabeth A. Fegan and Mark T. Vazquez, of Hagens Berman Sobol Shapiro LLP, and Philip H. Corboy Jr., of Corboy & Demetrio, P.C., both of Chicago, David Freydin and Timothy A. Scott, of Freydin Law Firm LLP, of Skokie, and Steve W. Berman, of Hagens Berman Sobol Shapiro LLP, of Seattle, Washington, for appellants.<br><br>Edward N. Siskel, Corporation Counsel (Benna Ruth Solomon, Assistant Corporation Counsel, of counsel), and Kirkland & Ellis LLP (Richard C. Godfrey, J. Andrew Langan, Andrew R. Running, and R. Chris Heck, of counsel), both of Chicago, for appellee. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justice Cunningham concurred in the judgment and opinion.
Justice Connors dissented, with opinion.


**OPINION**

¶ 1     Plaintiffs, Gordon Berry and Ilya Peysin, appeal the order of the circuit court dismissing their class action complaint alleging negligence and inverse condemnation, which they filed after the defendant City of Chicago (City) replaced the water main and/or water meter servicing their homes. On appeal, plaintiffs contend the court erred in dismissing their complaint where (1) the complaint sufficiently alleged a claim of negligence and plaintiffs properly sought medical monitoring as relief, based on the City's actions in replacing/repairing its lead pipe water service and water meters, and (2) plaintiffs sufficiently alleged a claim of inverse condemnation where the City's actions caused the release of high levels of lead in their water supply over time, resulting in damage to plaintiffs' property. For the following reasons, we reverse and remand for further proceedings.

¶ 2                              JURISDICTION
¶ 3     The trial court dismissed plaintiffs' complaint with prejudice on March 29, 2018. Plaintiffs filed their notice of appeal on April 20, 2018. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 4                              BACKGROUND
¶ 5     The following facts are alleged in plaintiffs' complaint.
¶ 6     Lead is a well-documented environmental contaminant "that is highly poisonous to humans" and "bioaccumulates in the body over time." Exposure to lead harms the nervous system and can lead to various ailments, "including neuropathy, motor nerve dysfunction, weakened immunity to disease, renal failure, gout, hypertension, muscle and joint pain, memory and concentration problems, and infertility." The effect of lead in the body is far more problematic in children and is connected to stunted brain development, reduction in intelligence quotient (IQ), intense aggression, and other behavior issues. Even low levels of lead exposure in children "have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."
¶ 7     Since the human body does not remove lead from the system, it accumulates over time and can remain for years in soft tissue, organs, bones, and teeth. Thus, the effect of lead on children can be " 'long lasting' " if not " 'permanent.' " Moreover, the effects of lead may not appear for years. Blood lead testing is a universally recognized and reliable method of testing lead levels because results can be compared "to the published standard of 10 μg/dL, established by the Center[s] for Disease Control" and Prevention (CDC).
¶ 8     In 1986, an amendment to the Safe Drinking Water Act (42 U.S.C. § 300f *et seq.*), imposed a ban on the use of lead pipes in public water systems. Safe Drinking Water Act Amendments

of 1986, Pub. L. No. 99-339, 100 Stat. 642. Up until this point, the City required residents to install lead service lines "even in the face of all the public health warnings over the past century." As a result, "nearly 80 percent of the properties in Chicago receive their drinking water via lead pipes." Over time, lead pipes can corrode resulting in the " 'transfer of dissolved or particulate lead into the drinking water.' " To minimize this risk, defendant treats its water supply with "Blended Polyphosphate," which causes a chemical reaction that coats "the interior of water mains, house services, and plumbing in an attempt to prevent the pipes from corroding" and leaching lead into the drinking water.

¶ 9        This treatment is not foolproof, however, and the protection can fail when "construction or street work, water and sewer main replacement, meter installation or replacement, or plumbing repairs" are performed. When the City replaces the water main or meter, the "[d]rilling, digging, as well as moving or bending [of] the pipes can all cause the interior coating to flake off and the polyphosphate protection to fail." When the water is turned back on, "the violent rush of water into the pipes disrupts the protective coating," putting residents at further risk of lead exposure. Unsafe lead levels can persist "for weeks or months after the disturbance."

¶ 10       Also, in reconnecting the residential lead service lines to the water mains after replacement or repair, the City performs a "partial" replacement in which it replaces a portion of the lead service line with copper. When sections of a lead pipe are replaced with copper, a galvanic cell (a battery) is created that can cause the release of lead into water as the pipes corrode. Organizations such as the American Academy of Pediatrics and the CDC Advisory Committee on Childhood Lead Poisoning Prevention have expressed concern about elevated water lead levels from partial lead service line replacements. This particular repair is discouraged by the United States Environmental Protection Agency's (EPA) science advisory board and the American Water Works Association. But it is standard procedure in Chicago when crews damage lead pipes during water main work. Cities such as Washington D.C. and Boston have ceased their accelerated lead service line replacement programs due to these dangers.

¶ 11       Between 2005 and 2011, the EPA tested the water of homes connected to lead service lines in Chicago to determine whether the Lead and Copper Rule (Rule), the existing federal regulation for sampling water, sufficiently identified high lead levels in the water supply. The Rule "seeks to manage lead levels in drinking water by setting a 'lead action level.' " Currently, " 'the lead action level is exceeded if the concentration of lead in more than 10 percent of tap water samples collected during any monitoring period … is greater than 0.015 mg/L.' " Using the Rule, the EPA found that "[o]f the 13 sites where there had been a recently documented physical disturbance *** virtually all of them produced samples that exceeded the lead action level under the Lead and Copper Rule," which was "in stark contrast" to samples taken from undisturbed sites. In October 2013, the commissioner of the Chicago Department of Water Management wrote a letter to alderman about the concerns raised in the study. The City, however, found that the water is "absolutely safe to drink."

¶ 12       The City began modernizing its water system in 2008 and since 2009 has conducted more than 1600 water main and sewer replacement projects. The American Water Works Association recommends that "immediately following a lead service line replacement, cold water should be run for at least 30 minutes at full flow after removing the faucet aerator" to flush out any lead debris that may have resulted from the replacement. It instructs that residents should begin at the lowest level of their homes and open the cold water taps fully, letting the water run for at least 30 minutes. After the 30 minutes, "they should turn off each tap starting

with the taps in the highest level of the home." The EPA also recommends that a household with lead service lines should flush pipes for three to five minutes whenever the water has not been used for several hours. Residents "should be warned that they should not consume tap water, open hot water faucets, or use an icemaker or filtered water dispenser until after flushing is complete."

¶ 13        Prior to 2013, the City informed residents after replacing water mains only that the water may be shut off a couple of times. In September 2013, the City began to advise residents to, after replacement of their old water main,

> "please open all your water faucets and hose taps and flush your water for 3 to 5 minutes. Sediment and metals can collect in the aerator screen located at the tip of your faucets. These screens should be removed prior to flushing. This flushing will help maintain optimum water quality by removing sediment, rust, or any lead particulates that may have come loose from your property's water service line as a result of the water main replacement."

¶ 14        Plaintiff Berry resides at 5411 S. Harper Avenue in Chicago. The City replaced the water main on his block in 1998, and replaced the water meter at his home in 2009. In replacing the water meter, the City disturbed the lead service lines running to his home, causing the interior protective coating to be compromised. Violent flushing of the water when it was turned back on caused more damage to the interior coating. The water meter was reconnected using galvanized pipes that placed Berry and his family at further risk of lead contamination. In January 2016, a routine check-up revealed that Berry's two-year-old granddaughter, who resided with him, had high lead levels in her blood.

¶ 15        On February 11, 2016, the City tested the water at Berry's residence, and results showed that it contained 17.2 parts per billion (ppb) of lead. The EPA's recommended lead action level is 15 ppb. On March 4, 2016, the City collected another 10 samples of drinking water from the residence, and the tests revealed results reaching as high as 22.8 ppb. Berry was not informed of these results until early May 2016, when an investigative reporter informed him that his residence appeared on a list showing addresses where the water supply tested for significant lead content. Berry's water was tested again, and the 10 samples taken showed lead levels ranging from 7.6 ppb to 30.8 ppb. Berry's granddaughter and her parents have since moved out of his home. Plumbers have confirmed that Berry's service line is lead, and Berry received quotes to replace the remaining portion of the lead service line that range from $14,000 to $19,000.

¶ 16        Plaintiff Peysin resides at 6529 N. Albany Avenue in Chicago, with his wife and children. In April 2015, the City replaced 2536 feet of water main on North Albany Avenue, which included the water main in front of Peysin's home. The letter did not warn Peysin of the potential for lead exposure as a result of the replacement but only advised that he "open all [his] water faucets and hose taps and flush [his] water for 3 to 5 minutes" in order to remove "sediment, rust, or any lead particulates that may have come loose from your property's water service line."

¶ 17        Peysin's water was tested on October 28, 2016, and the results showed that after five minutes of flushing, the lead level registered at 5.8 ppb, which was deemed "Significant." The report indicated that lead may be leaching into the tap water from the service line, and a plumber confirmed that Peysin's service line is lead. The report further advised Peysin that, although running water for a minute or more before using can help reduce lead exposure, it

"will not work" in his case because the lead level in his water was "Significant" or "Serious" after prolonged flushing.

¶ 18     The initial class action complaint against the City was filed on February 18, 2016, alleging one count of negligence and one count of inverse condemnation. The City filed a motion to dismiss, which the trial court granted without prejudice because plaintiffs had not adequately pled exposure absent documentary evidence. Plaintiffs thereafter tested their water and filed an amended complaint on January 9, 2017.

¶ 19     Count I of plaintiffs' amended complaint alleged that the City owed them "a duty to exercise reasonable care in providing safe drinking water, free from dangerous contaminants such as lead that would expose them to the unnecessary health risks documented herein." Defendants failed to exercise such care when "it did not take any measures to warn or protect Plaintiffs and Class members from lead exposure and, instead, *** misrepresent[ed] the safety of the water." As a result, "[d]efendant's negligence proximately caused Plaintiffs' and the Class members' damages and their increased risk of harm as documented herein." As relief, plaintiffs sought the establishment of a trust fund to pay for medical monitoring and the notification of all class members in writing that medical monitoring may be necessary to diagnose lead poisoning.

¶ 20     Count II alleged that, in conducting water main and water meter replacements, the City "irreversibly damage[d] the service lines of Plaintiffs and the class by making them more dangerous." The City's use of copper to reconnect the lead service lines owned by the plaintiffs further caused the release of lead into the drinking water because it causes the lead pipe to corrode "more aggressively than it would under normal circumstances." As a result, "Plaintiffs' property is damaged insofar as it is more dangerous than before." Plaintiffs sought "compensation for the damage to their lead service lines caused by the City's work" in the amount "necessary to fully replace their lead service lines with copper piping."

¶ 21     The City filed a motion to dismiss the amended complaint, arguing that plaintiffs have not alleged physical injuries or shown damage to their water service lines. The City also argued that the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-201 (West 2016)) barred plaintiffs' claims against the City. Attached to its motion was the affidavit of Andrea R.H. Putz, the water quality manager of the City's department of water management. In the affidavit, Putz stated that the City replaced the 54th Street water main in 1998, which connects to the Harper main servicing Berry's home. The Harper water main has not been replaced. Berry's water meter was replaced in 2005. The affidavit disputed plaintiffs' allegations that the elevated levels of lead found in Berry's water resulted from the City's disturbance of the water main or lead service lines servicing his home but stated instead that it came from the lead pipes located in his basement.

¶ 22     After a hearing, the trial court dismissed both counts of plaintiffs' amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2016)). As to count I, the court determined that "[n]o Illinois authority has permitted [a claim for medical monitoring] absent an allegation of a present injury." Since plaintiffs "readily concede that they lack a present injury," the court found their claim for medical monitoring to be "based solely on a potential risk for *future* harm," which is not recoverable under *Jensen v. Bayer AG*, 371 Ill. App. 3d 682 (2007). The trial court dismissed count II, plaintiffs' inverse condemnation claim, based on its finding that such a claim requires an allegation of special damage to property in excess of that sustained by the public generally. The court found that

the damages alleged by plaintiffs resulting from the City's work on the water pipes and meters was "borne equally by all residents of the City of Chicago attendant to *** the replacement of lead water mains." Plaintiffs filed their timely appeal.

¶ 23                                          ANALYSIS

¶ 24    The trial court dismissed plaintiffs' complaint pursuant to section 2-615 of the Code. A section 2-615 motion to dismiss challenges only the legal sufficiency of the complaint based on defects apparent on the face of the complaint. *DeHart v. DeHart*, 2013 IL 114137, ¶ 18. "The critical inquiry in deciding a section 2-615 motion to dismiss is whether the allegations of the complaint, when considered in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted." *Gonzalzles v. American Express Credit Corp.*, 315 Ill. App. 3d 199, 206 (2000). In making this determination, courts must accept as true all well-pleaded facts and reasonable inferences that can be drawn from those facts. *DeHart*, 2013 IL 114137, ¶ 18. A plaintiff need not prove his case at this pleading stage but must only allege sufficient facts to state the elements necessary to his cause of action. *Visvardis v. Eric P. Ferleger P.C.*, 375 Ill. App. 3d 719, 724 (2007). We review an order granting a section 2-615 motion to dismiss *de novo*. *DeHart*, 2013 IL 114137, ¶ 18.

¶ 25                                I. Count I—Negligence

¶ 26    "In a negligence action, the plaintiff must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from the breach." *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12. The City argues that we should affirm the dismissal of plaintiffs' negligence count because they conceded that they suffered no present injury. However, according to the record plaintiffs conceded only a lack of "present physical injury," not that no injury occurred at all. After the supposed confession, plaintiffs' counsel responded that in *Lewis v. Lead Industries Ass'n*, 342 Ill. App. 3d 95 (2003), they "made it very clear that there wasn't a present physical injury as well." Counsel further states, "What is the injury? The truth is that the city has created an environment in which all of these residents now must get tested to determine the extent of their potential physical injury."

¶ 27    As courts have recognized, the Restatement (Second) of Torts broadly defines an injury "as an invasion of a person's interest, even if there is no immediate harm or that harm is speculative." *White v. Touche Ross & Co.*, 163 Ill. App. 3d 94, 101 (1987) (citing Restatement (Second) of Torts § 7 cmt. a (1965)). Accepting plaintiffs' allegations as true, the City's negligent conduct in replacing water mains and water meters servicing plaintiffs' homes caused a high level of a dangerous contaminant, lead, to leach into their water. We can reasonably infer from these allegations that plaintiffs and their families drank the contaminated water serviced to their homes, thus exposing their bodies, and the organs, tissues, and bones therein, to lead. Plaintiffs set forth in their complaint that the human body does not transform lead in the system and therefore lead bioaccumulates and can remain in the tissues and bones for many years before a person develops an illness. Exposure to lead harms the nervous system and can lead to various ailments and behavior issues in children. Even low levels of lead exposure in children "have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells." We find that plaintiffs have sufficiently alleged a present injury in consuming

- 6 -

lead-contaminated water, even if they have yet to develop physical ailments linked to such consumption.

¶ 28    The City, however, points out that plaintiffs seek medical monitoring costs as damages and argues that this relief is only available to plaintiffs who have demonstrated a present physical injury. Otherwise, the City argues, plaintiffs are actually seeking damages only for an increased risk of future harm, which our supreme court disallowed in *Dillon v. Evanston Hospital*, 199 Ill. 2d 483 (2002), and *Williams v. Manchester*, 228 Ill. 2d 404 (2008).

¶ 29    In *Dillon*, the plaintiff brought a medical malpractice action alleging that the doctor treating her for breast cancer inadvertently left in her chest a nine-centimeter fragment of the catheter used to administer chemotherapy. *Dillon*, 199 Ill. 2d at 487. The plaintiff did not know that the catheter was not removed in its entirety. *Id.* A routine X-ray taken more than two years later revealed that the fragment had migrated to her heart with the tip embedded in the wall of the right atrium or right ventricle. *Id.* at 487-88. Plaintiff decided, based on the opinions of doctors, to leave the catheter fragment in her heart because it would be more dangerous to remove the fragment than to leave it in place. *Id.* at 488. The case proceeded to trial, and the jury awarded plaintiff $1.5 million for past pain and suffering, $1.5 million for future pain and suffering, and $500,000 for the increased risk of future injuries. *Id.* at 488-89. The appellate court affirmed the judgment. *Id.* at 489.

¶ 30    On appeal to the supreme court, the defendants argued that the trial court erred in instructing the jury it could award damages based on the increased risk of future injuries where it was not reasonably certain plaintiff would suffer those injuries in the future. *Id.* at 496-97. The evidence at trial showed that plaintiff's risk of future infection ranged between close to 0% up to 20%, her risk of arrhythmia was less than 5%, the risks of perforation and migration were small, and the risk of embolization was low to nonexistent. *Id.* at 497.

¶ 31    The supreme court acknowledged that it "has historically rejected assessing damages for future injuries." *Id.* However, the court felt compelled to revisit the issue and noted "a trend toward allowing compensation for increased risk of future injury as long as it can be shown to a reasonable degree of certainty that the defendant's wrongdoing created the increased risk." *Id.* at 500. The court found there is no element of speculation in awarding damages where the plaintiff has competent evidence that the defendant negligently caused her to bear the burden of an increased risk of future injury. *Id.* at 501. In this situation, "the treatment of an increased risk of future injury as a present injury does not run afoul of the general rule." *Id.* The court determined that the trial court did not err in allowing the jury to award damages for an increased risk of future injuries because "a plaintiff must be permitted to recover for *all* demonstrated injuries." (Emphasis in original.) *Id.* at 504. In other words, where the plaintiff has shown a present injury, she may obtain relief for an increased risk of future harm as an element of damages. See *id.* at 503-04.

¶ 32    In *Williams*, the plaintiff was 10½ weeks pregnant with Baby Doe when she was involved in a serious accident while riding as a passenger in an automobile. *Williams*, 228 Ill. 2d at 407. She was taken to the hospital where an X-ray revealed she suffered a broken hip and broken pelvis from the accident. *Id.* at 408. After discussing with doctors about the various treatments for her and possible effects on the fetus, plaintiff decided to terminate her pregnancy approximately one week after the accident. *Id.* at 412. Plaintiff subsequently filed a complaint against the defendant in which one count sought damages for injuries to Baby Doe, " 'including radiation and medication exposure' " due to plaintiff receiving a computerized axial

tomography (CAT) scan and pelvic X-rays while she was pregnant. *Id.* at 414. She attached an affidavit by a doctor who opined that Baby Doe's radiation exposure produced an increased risk of future injury. *Id.* at 415.

¶ 33     The supreme court noted, however, that plaintiff's experts "did not opine that Baby Doe's radiation exposure resulted in an actual, present injury, but rather that the fetus incurred an increased risk of future harm." *Id.* at 424-25. The court declined to expand *Dillon* so as to equate an increased risk of future harm with a present injury, especially where the plaintiff did not present any evidence of damages because "there can be no legal injury without damages." *Id.* at 425-26. The court did not find that Baby Doe's exposure to X-rays or medication could not be a present, actionable injury. Rather, the court determined that plaintiff's proof of injury was insufficient because the testimony showed only that Baby Doe incurred an increased risk of future harm with no present damages. *Id.* at 427.

¶ 34     *Dillon* and *Williams* require only that plaintiffs establish a present injury in which they suffer damages and express no requirement that plaintiffs' injury be a present physical harm or ailment in order to recover in tort. Viewing the complaint in the light most favorable to plaintiffs, they sufficiently allege a present injury due to their consumption of water containing high levels of lead. Furthermore, plaintiffs' complaint alleges the need for medical testing due to plaintiffs' consumption of lead-contaminated water. Their complaint states that blood lead testing is a universally recognized and reliable method of testing lead levels because results can be compared "to the published standard of 10µg/dL, established by" the CDC. As damages they seek the costs of such testing and monitoring.

¶ 35     These damages clearly flow from plaintiffs' injury and are not speculative, as they are capable of proof within a reasonable degree of medical certainty. See *Lewis*, 342 Ill. App. 3d at 101. Where such testing is made necessary by defendant's breach of duty, courts have found that the testing itself is "a present injury compensable in a tort action." *Id.* at 101-02; *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 826 (D.C. Cir. 1984). We find that plaintiffs have sufficiently alleged facts to support their claims of injury and damages due to the City's negligence. We reiterate that our focus here is simply whether plaintiffs alleged sufficient facts to state a cause of action, not whether they presented sufficient evidence to prevail on every element of their claims. Plaintiffs need not prove their case at this pleading stage. *Visvardis*, 375 Ill. App. 3d at 724.

¶ 36     *Jensen*, a case relied on by the City and the trial court below, does not require a different result. In *Jensen*, the plaintiff was prescribed and took Baycol to lower his cholesterol after he suffered a heart attack. *Jensen*, 371 Ill. App. 3d at 685. In August 2001, defendant, the manufacturer of Baycol, issued a statement that it was removing Baycol from the market because some users of Baycol and other statin drugs reported development of rhabdomyolysis as a serious and potentially fatal side effect. *Id.* at 684. Plaintiff filed an action in which he claimed that defendant's product subjected him to unnecessary future health risks that require medical monitoring. *Id.*

¶ 37     Plaintiff testified that he took Baycol from May 2000 to August 2001. He suffered from pain in his calves and legs, and he concluded that the pain resulted from his taking Baycol. *Id.* at 685. The pain, however, did not cause plaintiff to miss work, nor did he know of any increased risk to his future health from his prior use of Baycol. *Id.* Plaintiff testified that he has no reason to believe that his future health is at risk from his consumption of Baycol. *Id.* The record contained deposition testimonies of two medical professionals. *Id.* Each physician

acknowledged that all statin drugs carry the risk of rhabdomyolysis; however, the benefits of lowering cholesterol " 'way outweigh the risks of a very, very rare event taking place.' " *Id.* at 685-86. Plaintiff's current physician stated that, although plaintiff had used Baycol in the past, he did not find it necessary that plaintiff undergo any special testing or monitoring. *Id.* at 686. The trial court granted defendant's motion for summary judgment on the medical monitoring count, finding no evidence that plaintiff needed future medical monitoring due to his past use of Baycol. *Id.* at 687.

¶ 38   This court affirmed the trial court's determination, finding that plaintiff offered "nothing in support of his medical monitoring claim other than his own allegation that Baycol caused him leg cramps" while he was taking it. *Id.* at 692. Plaintiff alleged no present injury. The court distinguished *Lewis*, finding that it did not address whether a plaintiff may bring a claim for medical monitoring for potential future harm where he has shown no present injury. *Id.* at 693. *Jensen* is distinguishable. Here, taking plaintiffs' factual allegations as true, they have sufficiently alleged a present injury necessitating medical monitoring.[1]

¶ 39   The City also argues that the single recovery principle precludes plaintiffs' claim for the costs of medical monitoring because if "future injuries actually appeared, then there would be a trial each time an injury occurred to determine causation and damages for that injury." "The single recovery principle requires that all damages, future as well as past, must be presented and considered at the time of trial." *Dillon*, 199 Ill. 2d at 502. Thus, "[a]n entire claim arising from a single tort cannot be divided and be the subject of several actions, regardless of whether or not the plaintiff has recovered all that he or she might have recovered." *Id.* However, as plaintiffs point out, the present complaint is the only one they have filed, and no other actions have been filed. This court should not find plaintiffs' allegations barred based on what might happen in the future. Such a determination would be improperly speculative and premature at this time. *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 469 (2003).

¶ 40   Nor do we find persuasive the City's argument that the *Moorman* doctrine applies to bar plaintiffs' claim. The doctrine, derived from *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 86 (1982), provides that the remedy for economic loss, or "loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause," lies in contract rather than theories of tort. The City's argument that the doctrine applies presumes that plaintiffs' claim for medical monitoring costs represents purely economic damages. Plaintiffs' alleged injuries and claimed damages, however, do not relate to disappointed expectations based on contract law. Instead, their medical monitoring claims stem from the harm they suffered because the City's alleged misconduct caused high levels of lead to leach into the water they consumed. Such claims are more in line with tort theory, and thus, we find the *Moorman* doctrine inapplicable. See *id.*

¶ 41   The City next argues that we should affirm the dismissal of plaintiffs' negligence claims because they are barred by the Tort Immunity Act.[2] Such immunity is an "affirmative matter"

---

[1]The City also cites a Michigan case, *Henry v. Dow Chemical Co.*, 701 N.W.2d 684 (Mich. 2005), in support of its argument that medical monitoring is not a cognizable claim for plaintiffs' injuries. We need not look to the law of other jurisdictions, however, when Illinois law is more than sufficient on the issue. *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 47.

[2]While the trial court did not dismiss plaintiffs' complaint based on section 2-619 or consider the tort immunity issue in its order, the parties raised the issue before the trial court and in their briefs, and

properly raised under section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2016)). *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 377 (2003). A section 2-619 motion to dismiss admits the legal sufficiency of plaintiffs' complaint, but raises defects, defenses, or other affirmative matters that defeat plaintiffs' claims. *Mack Industries, Ltd. v. Village of Dolton*, 2015 IL App (1st) 133620, ¶ 19. The affirmative matter "must be apparent on the face of the complaint" or "be supported by affidavits or certain other evidentiary materials." *Van Meter*, 207 Ill. 2d at 377. The defendant bears the initial burden of establishing the affirmative defense. *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 383 (1997). In determining a section 2-619 motion to dismiss, courts "must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 189 (1997). Our standard of review is *de novo*. *Van Meter*, 207 Ill. 2d at 368.

¶ 42     The City argues that section 2-201 of the Tort Immunity Act applies here. Section 2-201 provides:

> "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2016).

Policy decisions made by a municipality "require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests." *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992). On the other hand, discretionary acts are "those which are unique to a particular public office." *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995). "Municipal defendants are required to establish both of these elements in order to invoke immunity under section 2-201." *Van Meter*, 207 Ill. 2d at 379. Municipal actions that involve " 'merely the execution of a set task *** [such] that nothing remains for judgment or discretion' " are considered ministerial and are not subject to immunity. *In re Chicago Flood*, 176 Ill. 2d at 193-94.

¶ 43     The City argues that it was determining policy when it decided to modernize the water system and that deciding what precautions to advise residents to take was an exercise of discretion. While the decision to replace lead water pipes may be viewed as a policy determination, plaintiffs here do not challenge the City's decision to modernize their water system. Instead, plaintiffs take issue with *how* the City conducted the replacement project after the decision was made to modernize and with *how* residents were advised to treat their water afterwards. It is not apparent from the face of plaintiffs' complaint that the City's advice was unique to a particular public office or discretionary. In fact, plaintiffs' complaint alleged otherwise. Plaintiffs alleged that, according to the American Water Works Association, "immediately following a lead service line replacement, cold water should be run for at least 30 minutes at full flow after removing the faucet aerator" to flush any lead debris that may have resulted from the replacement. Their complaint also set forth the manner in which the flushing should occur: residents should begin at the lowest level of their homes and open the cold water taps fully, letting the water run for at least 30 minutes. After the 30 minutes, "they should turn off each tap starting with the taps in the highest level of the home." The EPA cautions that residents "should be warned that they should not consume tap water, open hot

_____

it is an issue of law. Therefore, this court may consider the issue on appeal. See *Brugger v. Joseph Academy, Inc.*, 326 Ill. App. 3d 328, 330 (2001).

water faucets, or use an icemaker or filtered water dispenser until after flushing is complete." Plaintiffs' complaint, liberally construed, alleged that advising and warning residents in this situation is akin to an "execution of a set task" where "nothing remains for judgment or discretion."

¶ 44 This is in contrast to the complaint in *In re Chicago Flood*, a case cited by the City. In that case, the City hired a dredging company to replace bridge piling clusters, and a tunnel wall under the Chicago River was breached during pile driving. A number of downtown businesses were flooded as a result of the breach, and in their complaint the plaintiffs alleged, among other things, that the City failed to warn them about the danger of flood after learning of the breach. *Id.* at 184-86. The supreme court found the City's actions discretionary in nature, rather than ministerial, because the plaintiffs "do not allege that there was any prescribed method for how to repair the tunnel and how quickly, or how to warn class plaintiffs of the tunnel breach." *Id.* at 196-97. Plaintiffs here, however, have set forth a prescribed method of advising residents to flush, and how to flush, the water in their homes after lead pipe work.

¶ 45 Furthermore, although the City submitted Putz's affidavit in support of its motion to dismiss, the affidavit does not state facts to support the City's argument that its actions were discretionary. Instead, her affidavit disputes plaintiffs' factual allegations concerning the source of the lead in plaintiff Berry's water. Where the affirmative matter is merely evidence upon which a defendant expects to challenge an ultimate fact stated in the complaint, it is insufficient to support a section 2-619 motion to dismiss. *In re Marriage of Vaughn*, 403 Ill. App. 3d 830, 835-36 (2010). Since the City has not established both elements of section 2-201 immunity under the Tort Immunity Act, dismissal of plaintiffs' negligence claim pursuant to section 2-619 of the Code would be error.

¶ 46 The City briefly argues that section 2-107 of the Tort Immunity Act and common-law immunity also bar plaintiffs' negligence claims. Section 2-107 provides that a "local public entity is not liable for injury caused by any action of its employees that is libelous or slanderous or for the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material." 745 ILCS 10/2-107 (West 2016). The City merely argues, without further analysis, that plaintiffs' complaint seeks to impose liability based on the City's provision of information, which is barred by section 2-107. The City also argues that absolute immunity applies to protect government officials from liability for statements made within the scope of official duties. The City again merely concludes that count I claims that City officials should have made statements about the water in plaintiffs' homes and "[s]uch officials are immune from liability for making or omitting such statements. Therefore, the City is immune as well, under settled Illinois law."

¶ 47 We find that the City has not met its burden to establish this affirmative defense. "Because the Tort Immunity Act is in derogation of the common law, it must be strictly construed against the public entities involved." *Van Meter*, 207 Ill. 2d at 380. At the very least, questions of fact exist as to whether the City's provision of information falls within the protections of this section precluding dismissal under section 2-619. See *id.* Furthermore, the cases cited in the City's brief involve claims for defamation. See *Dolatowski v. Life Printing & Publishing Co.*, 197 Ill. App. 3d 23 (1990); *Harris v. News-Sun*, 269 Ill. App. 3d 648 (1995); *Morton v. Hartigan*, 145 Ill. App. 3d 417 (1986). Plaintiffs' complaint, however, makes no claim for

defamation.[3]

¶ 48                          II. Count II—Inverse Condemnation

¶ 49      Plaintiffs argue that the trial court improperly dismissed count II of their complaint, pursuant to section 2-615 of the Code, where they sufficiently alleged a claim for inverse condemnation. An inverse condemnation claim is a claim for the governmental taking of a property interest without compensation, where no condemnation proceeding has been initiated. *City of Chicago v. ProLogis*, 236 Ill. 2d 69, 76-77 (2010). As our supreme court found, "the Illinois takings clause reaches beyond the scope of the federal takings clause" to provide a remedy when government action damages private property. *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, ¶ 27. This constitutional provision, however, "was not intended to reach every possible injury that might be occasioned by a public improvement." *Belmar Drive-In Theater Co. v. Illinois State Toll Highway Comm'n*, 34 Ill. 2d 544, 550 (1966). Rather,

> "[p]roperty is considered damaged for purposes of the takings clause if there is 'any direct physical disturbance of a right, either public or private, which an owner enjoys in connection with his property; a right which gives the property an additional value; a right which is disturbed in a way that inflicts a special damage with respect to the property in excess of that sustained by the public generally.' " *Hampton*, 2016 IL 119861, ¶ 27 (quoting *Citizens Utilities Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 25 Ill. App. 3d 252, 256 (1974)).

¶ 50      In their complaint, plaintiffs allege that the City embarked on a project to replace water mains and water meters throughout Chicago. In replacing the water mains and meters, however, plaintiffs allege that the City disturbed the polyphosphate interior coating of nearby lead pipes, causing its protection to be compromised. Furthermore, after replacing the water mains and meters, the City reconnected the service lines to certain property owners by performing a partial lead service line replacement, which can cause more lead to release into the water over time. Plaintiffs allege that, as a result, property owners with lead service lines in areas where a water main or meter was replaced have been, and continue to be, exposed to dangerous levels of lead in their water.

¶ 51      Plaintiffs, as property owners, have the right to the use and enjoyment of their property without interference. *Cuneo v. City of Chicago*, 379 Ill. 488, 493 (1942). They have the rightful expectation that they will be able to use their properties to maintain a home. *Hampton*, 2016 IL 119861, ¶ 26. The dangerous contamination of water coming into plaintiffs' residences, water that is consumed and used by the residents, certainly interferes with the use and enjoyment of their property. However, plaintiffs must also allege special damages in order to recover for " 'the lawful damaging of private property for public use.' " *Id.* ¶ 27.

¶ 52      The City argues that the number of potential plaintiffs could be large and thus plaintiffs' damages cannot be characterized as special damages. The cases cited, however, do not support this argument. In *City of Chicago v. Union Building Ass'n*, 102 Ill. 379, 391-92 (1882), the

---

[3]The parties disagree whether the Tort Immunity Act applies to plaintiffs' inverse condemnation claim. We need not decide that particular issue at this time because, even if it did apply, we find that the City has not established this affirmative defense as to plaintiffs' inverse condemnation claim for the same reasons.

court found that no "special or peculiar injury" to property resulted from the partial closure of La Salle Street because "[p]recisely the same injury will result to every one, wherever located, having to pass that route." In *Parker v. Catholic Bishop of Chicago*, 146 Ill. 158, 168 (1893), the court defined special injury or damage as "differing in kind from those affecting the general public." It found that the plaintiff, "having to go a few feet further to gain access" from an adjacent street, suffered the "same kind" of damage as that sustained by " 'all other persons in the city that might have occasion to go that way' " and affirmed the dismissal of the action. *Id.* at 168-69. In *Department of Public Works & Buildings v. Horejs*, 78 Ill. App. 2d 284, 291 (1966), property owners claimed that a newly constructed expressway embankment obstructed their light, air, and view. The complaining property owners, however, were "not abutting owners to the highway embankment construction, nor was the embankment built on the road which fronts [their] property; nor was the expressway constructed on or across any part of the property taken from [them]." *Id.* at 292. The court determined that the alleged damages were suffered in "common to all property owners in the area and the law provides them no basis for compensation." *Id.*

¶ 53    These cases do not establish that damages suffered by numerous plaintiffs cannot be "special damages." Rather, they illustrate that the proper focus in determining special damages is ascertaining the type of damage suffered by the property owner due to the City's actions and whether or not it is the same damage suffered by the general public. In their complaint, plaintiffs here allege that the City's replacement of water mains and meters disrupted the protective coating of their lead service lines, causing harmful levels of lead to leach into their water. They allege that the City further damaged their property when it partially replaced lead service lines when reconnecting water service to the newly replaced water mains. As a result, these lead service lines have become "more dangerous" than lines that have not been partially replaced or are not made of lead. We find that plaintiffs' complaint sufficiently alleges they have incurred excess damages beyond that experienced by the public generally.

¶ 54    The City also argues that plaintiffs' inverse condemnation claim should be dismissed because the public improvement work the City performed was "necessarily incident to property ownership" and damages flowing from such actions are not afforded relief under the law. Instead, "[s]uch injury is deemed to be *damnum absque injuria*" or "loss without injury in the legal sense." *Belmar*, 34 Ill. 2d at 550. In *Belmar*, the plaintiff owned an outdoor movie theater adjacent to a toll-road service center, or oasis, built by the Illinois State Toll Highway Commission. *Id.* at 546. Plaintiff filed a complaint alleging that the bright artificial lights emanating from the oasis dispel the darkness on neighboring property, making the exhibition of outdoor movies impossible. *Id.* The court found that plaintiff's use of the property was a sensitive one and the damages claimed, the bright lights, resulted only from the property's location next to the oasis. *Id.* at 550-51. While plaintiff did suffer damages, the court deemed such injury "*damnum absque injuria*" because "the property owner is compensated for the injury sustained by sharing the general benefits which inure to all from the public improvement." *Id.*

¶ 55    *Belmar* is distinguishable. Plaintiffs here did not share in the general benefits of the replaced water mains where such replacement, they alleged, actually made their water more dangerous than that consumed by the general public. Nor do plaintiffs' damages stem from a sensitive use of their property, as was the case in *Belmar*. The City argues that accepting plaintiffs' theory here "would greatly expand the scope of inverse condemnation claims and

obstruct needed public improvements." We disagree. Our supreme court has limited recovery to plaintiffs who plead and prove special damages "in excess of that sustained by the public generally." *Rigney v. City of Chicago*, 102 Ill. 64, 81 (1881). Such a limitation should reduce the number of claims from property owners only incidentally affected by public improvements.

¶ 56    Since we find that plaintiffs have sufficiently pled their claims, dismissal pursuant to section 2-615 of the Code was error.

¶ 57    For the foregoing reasons, the judgment of the circuit court is reversed and the cause remanded for further proceedings.

¶ 58    Reversed and remanded.

¶ 59    JUSTICE CONNORS, dissenting:

¶ 60    Water is essential for life and should be safe to drink. Lead is a toxic chemical that accumulates in one's body over time and is highly poisonous to humans. There may be a complaint that would state a claim to appropriately consider the levels of lead in Chicago's water and the cause thereof, but this is not that complaint. Although plaintiffs' allegations paint a concerning picture, they are insufficient to state a claim for either negligence or inverse condemnation under current Illinois law, and contrary to the majority, I decline to misconstrue our supreme court's precedent in order to make the complaint viable. Therefore, I respectfully dissent and would affirm the trial court's decision to dismiss counts I and II.

¶ 61                              A. Count I: Negligence

¶ 62    It is axiomatic that, "[t]o state a cause of action for negligence, a plaintiff must plead the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and damages." *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 194-95 (1995). The primary issue in this case is whether plaintiffs have stated a cause of action for common-law negligence without alleging that they suffer from a present physical (or actual) injury. In my opinion, they have not. I believe that based on our supreme court's decision in *Williams v. Manchester*, 228 Ill. 2d 404 (2008), the single recovery principle, the *Moorman* doctrine, and general public policy considerations, the majority recognizes a claim that runs contrary to Illinois law.

¶ 63    It is undisputed that plaintiffs do not suffer from any present physical injury and are completely asymptomatic. Nonetheless, the majority finds they have stated a claim for negligence because "plaintiffs have sufficiently alleged a present injury in consuming lead-contaminated water, even if they have yet to develop physical ailments linked to such consumption." *Supra* ¶ 27. The majority's holding is significant, not only because it is the first of its kind in Illinois and is contrary to our supreme court's decision in *Williams*, but also because plaintiffs have never made the argument that mere exposure or consumption suffices as a present injury in order to bring a negligence claim.

¶ 64    The majority reaches its holding by accepting as true plaintiffs' allegations that defendant's negligent conduct caused a high level of lead to leach into their water. The majority then makes the inference that "plaintiffs and their families drank the contaminated water serviced to their homes, thus exposing their bodies, and the organs, tissues, and bones therein, to lead." That the majority finds it necessary to infer that plaintiffs' bodies, organs, tissues, and bones were

- 14 -

exposed to lead is extremely telling. To me, it indicates that plaintiffs have not, in fact, alleged that their injury is exposure to, or consumption of, lead in their water. If plaintiffs had alleged that, the majority would not need to make such an inference. In the lower court and on appeal, plaintiffs have instead consistently asserted that the cost of medical testing sufficed as a present injury and relied on *Lewis v. Lead Industries Ass'n*, 342 Ill. App. 3d 95 (2003), as support. It is apparent from the briefing in the trial court and the parties' appellate briefs that the crux of plaintiffs' contentions hinged on *Lewis*. Interestingly, however, the majority barely addresses *Lewis* and fails to provide any insight as to the facts of that case or its holding. Similarly lacking is the majority's analysis of the single-recovery principle and the *Moorman* doctrine. I write separately to take a deeper look into *Williams*, *Lewis*, the single-recovery principle, the *Moorman* doctrine, and other policy considerations that I believe are necessary to the resolution of this appeal.

¶ 65                                1. *Dillon* and *Williams*

¶ 66        The majority concludes that the mere consumption of, or exposure to, lead-contaminated water suffices as a present injury, such that plaintiffs have stated a claim for negligence. I find this conclusion problematic for various reasons, not least of which is that it is directly contrary to our supreme court's decision in *Williams* and that no court in Illinois has ever rendered such a holding.

¶ 67        In order to explain *Williams*, it is necessary to first mention our supreme court's decision in *Dillon v. Evanston Hospital*, 199 Ill. 2d 483 (2002). In *Dillon*, the court acknowledged that it had "historically rejected assessing damages for future injuries" but was compelled to revisit that rule based on "a trend toward allowing compensation for increased risk of future injury as long as it can be shown to a reasonable degree of certainty that the defendant's wrongdoing created the increased risk." *Id.* at 497-500. The court, quoting a Connecticut case, recognized that part of the basis for this trend was that " '[o]ur legal system provides no opportunity for a second look at a damage award so that it may be revised with the benefit of hindsight.' " *Id.* at 501 (quoting *Petriello v. Kalman*, 576 A.2d 474, 483 (Conn. 1990)). As a result, our supreme court adopted a new rule that "better comports with this state's principle of single recovery" (*id.* at 502), which provided "simply that a plaintiff must be permitted to recover for *all* demonstrated injuries" and that "[t]he burden is on the plaintiff to prove that the defendant's negligence increased the plaintiff's risk of future injuries" (emphasis in original) (*id.* at 504). Although not mentioned by the majority in this case, the supreme court in *Dillon* explained its reasoning as follows:

> "An entire claim arising from a single tort cannot be divided and be the subject of several actions, regardless of whether or not the plaintiff has recovered all that he or she might have recovered. This is true even to prospective damages. There cannot be successive actions brought for a single tort as damages in the future are suffered, but the one action must embrace prospective as well as accrued damages." *Id.* at 502.

Our supreme court also explained that its previous decisions that did not recognize the increased risk of future injury as a compensable injury were decided over 80 years ago, and that scientific advances had made it easier for the medical community to more accurately determine the probability of future injuries. *Id.* at 503. Therefore, the risk of undue speculation was lessened. *Id.*

¶ 68 Subsequently, our supreme court addressed a related issue in *Williams*. In *Williams*, the plaintiff sought damages for the death of her unborn fetus, Baby Doe. *Williams*, 228 Ill. 2d at 407. The plaintiff opted to terminate her pregnancy after an X-ray revealed she suffered a broken pelvis in a car accident caused by the defendant's negligence and was told that she would have to remain bedridden and may not ever walk normally again if she stayed pregnant. *Id.* at 408. The trial court granted summary judgment, a split panel of the appellate court reversed, and our supreme court affirmed the trial court's decision. *Id.* at 415, 427. Although our supreme court recognized that the appellate court's observation that, " '[a]side from the additional element of the occurrence of death, the elements of a wrongful death claim are identical to those of a common law negligence claim' " (*id.* at 421-22) was correct, it reversed the appellate court's decision, noting that the appellate court had incorrectly identified the actionable injury in the plaintiff's wrongful death claim as Baby Doe's death. *Id.* at 423. The court explained that, "a wrongful-death action is premised on the deceased's potential, at the time of death, to bring an action for injury" and that "it was 'not until the death occurred could the court examine whether there was a viable wrongful injury which would permit the case to proceed.' " *Id.* at 423-24. The court determined that Baby Doe could not have maintained a claim for personal injury against the defendant because a doctor testified that Baby Doe was not injured during the accident and the plaintiff admitted that she never claimed Baby Doe was injured in the crash but rather was injured in the hospital following the crash. *Id.* at 424. The court also found significant that, at oral argument, "[the] plaintiff expressly conceded that, for purposes of summary judgment, the record did not contain sufficient evidence that Baby Doe suffered a present, actionable injury as a result of the radiation exposure" and that the doctors who testified "did not opine that Baby Doe's radiation exposure resulted in an actual, present injury, but rather that the fetus incurred an increased risk of future harm." *Id.* at 424-25.

¶ 69 Next, the court addressed whether Baby Doe's increased risk of future harm from radiation exposure was a present injury for which the fetus could have brought an action for damages against defendant. *Id.* at 425. The court rejected this premise for two reasons. First, the court stated, "as a matter of law, an increased risk of future harm is an *element of damages* that can be recovered for a present injury—it is *not* the injury itself." (Emphases in original.) *Id.* The court compared the case before it with *Dillon* and explained that in that case, the present injury was the catheter embedded in the plaintiff's heart. *Id.* Unlike the plaintiff in *Dillon*, Baby Doe had no such present injury. Second, the court stated that, "even if we were to convert or expand *Dillon* so as to describe an increased risk of future harm as a present injury, plaintiff, as a matter of fact, has not presented any evidence that Baby Doe was injured as a result of the increased risk." *Id.* at 426.

¶ 70 Here, the majority concludes, "*Dillon* and *Williams* require only that plaintiffs establish a present injury in which they suffer damages and express no requirement that plaintiffs' injury be a present physical harm or ailment in order to recover in tort." *Supra* ¶ 34. I disagree with this conclusion and believe the majority's decision fails to follow the holding of *Williams*. "It is well settled that this court is bound to follow the supreme court's precedent, and 'when our supreme court has declared law on any point, only [the supreme court] can modify or overrule its previous decisions, and all lower courts are bound to follow supreme court precedent until such precedent is changed by the supreme court.' " *Certain Underwriters at Lloyd's, London v. Reproductive Genetics Institute*, 2018 IL App (1st) 170923, ¶ 19 (quoting *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 366 Ill. App. 3d 730, 734 (2006)).

- 16 -

¶ 71    Although perhaps not explicit, the supreme court's analysis in *Williams* indicated that mere exposure to a potentially harmful substance, *i.e.*, radiation, is not an actionable present injury in a wrongful death case. This can be said with certainty because the plaintiff in *Williams* was unable to pursue a wrongful death claim on behalf of Baby Doe because the fetus had not suffered any injury, even though Baby Doe had been exposed to radiation when the plaintiff was X-rayed.[4] If mere exposure to a harmful or toxic substance, such as radiation or lead, was sufficient to establish an actionable injury, then the court would have found the unborn fetus had suffered an injury, since it was undisputed that the plaintiff underwent an X-ray while pregnant with the fetus. However, the court did not find that exposure equates to an injury and instead found that exposure amounted to an "increased risk of future harm," which "is *not* the injury itself." (Emphasis in original.) *Williams*, 228 Ill. 2d at 425.

¶ 72    Ultimately, it is perplexing how the majority can rectify its holding with *Williams*. Despite acknowledging *Williams*'s holding that the unborn fetus's radiation exposure was merely an increased risk of harm and that an increased risk of harm is not a present injury, the majority expressly finds "that plaintiffs have sufficiently alleged a present injury in consuming lead-contaminated water, even if they have yet to develop physical ailments linked to such consumption." *Supra* ¶ 27. Although *Williams* involved a wrongful death claim, the same principles apply here because both a wrongful death claim and a common-law negligence claim require an actionable injury. *Williams* made clear that a plaintiff cannot recover for an increased risk of future injury without showing a present physical (or actual) injury, and thus I would affirm the trial court's decision to grant summary judgment on count I.

¶ 73                                    2. *Lewis*

¶ 74    Next, I find it necessary to address *Lewis*, 342 Ill. App. 3d 95, the primary case upon which plaintiffs relied but that the majority barely addresses. In *Lewis*, the plaintiffs brought a six-count putative class action on behalf of themselves and all other similarly situated parents and guardians of minor children who had undergone or would undergo medical screening, assessment, or monitoring for lead poisoning or latent diseases associated with lead poisoning. *Id.* at 98. The numerous defendants consisted of promoters, manufacturers, marketers, and distributors of lead pigment for use in paint. *Id.* "Common to each count was a prayer seeking an order compelling the defendant to reimburse and pay the plaintiffs and the members of the

---

[4]Further support for my reading of *Williams* is found in an unpublished federal case. Although unpublished federal decisions are not binding or precedential in Illinois courts, nothing prevents this court from using the same reasoning and logic as used in an unpublished federal decision. *CitiMortgage, Inc. v. Parille*, 2016 IL App (2d) 150286, ¶ 37. In *Rowe v. Unicare Life & Health Insurance Co.*, No. 09 C 2286, 2010 WL 86391, at *6 (N.D. Ill. Jan. 5, 2010), the court held that, "[b]eyond simply establishing that the increased risk of future harm is not a present injury, the *Williams* decision also rules out the possibility that in this case the exposure of personal information might be the present injury providing the basis for recovery of damages for increased risk of future harm." *Rowe* further explained, "[the plaintiff] may collect damages based on the increased risk of future harm he incurred, but only if he can show that he suffered from some present injury beyond the mere exposure of his information to the public." *Id. Rowe* also mentioned *Dillon* and explained that, "[w]hile it may seem odd to allow [the plaintiff] to collect damages based on his vulnerability to identity theft only if he can prove a substantively different type of present injury such as emotional distress, this result is in concert with the principles that led the *Dillon* Court to its decision in the first place." *Id.*

putative class for the costs of all medical screenings, assessments, and monitoring of their minor children." *Id.* at 99. The circuit court granted the defendants' section 2-615 motion to dismiss, which asserted that the plaintiffs' complaint failed to allege a present injury or facts in support of proximate cause. *Id.* The circuit court determined that the relief sought by the plaintiffs could be characterized as damages for an increased risk of future harm. *Id.* at 100. On appeal, the plaintiffs argued that the court below misconstrued their relief sought because they did not seek relief for an increased risk of future harm and sought compensation only for the cost of medical testing made necessary by the defendants' manufacturing, marketing, and sale of a dangerous product. *Id.* at 100-01.

¶ 75    This court began its analysis by recognizing that, "in order for a plaintiff to recover damages for an increased risk of future harm in a tort action, he or she must establish, among other things, that the defendant's breach of duty caused a present injury which resulted in that increased risk." *Id.* at 101 (citing *Dillon*, 199 Ill. 2d at 496-507). The court pointed out that the plaintiffs primarily relied on *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984), to support their contention that an action seeking recovery for the cost of medical examinations is distinct from a claim seeking damages for an increased risk of harm of developing a future injury or disease. *Lewis*, 342 Ill. App. 3d at 101. The *Lewis* court stated that, "In *Friends for All Children*, the court reasoned that 'an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury.' " *Id.* (quoting *Friends for All Children, Inc.*, 746 F.2d at 826). The court then expressed its agreement with *Friends for All Children* and recognized the following:

> "There is a fundamental difference between a claim seeking damages for an increased risk of future harm and one that seeks compensation for the cost of medical examinations. The injury which is alleged, and for which compensation is sought, in a claim seeking damages for an increased risk of harm is the anticipated harm itself. The injury that is alleged, and for which compensation is sought, in a claim seeking damages for a medical examination to detect a possible physical injury is the cost of the examination. Unlike a claim seeking damages for an increased risk of future harm, a claim seeking damages for the cost of a medical examination is not speculative and the necessity for such an examination is capable of proof within a 'reasonable degree of medical certainty.' If a defendant's breach of duty makes it necessary for a plaintiff to incur expenses to determine if he or she has been physically injured, we find no reason why the expense of such an examination is any less a present injury compensable in a tort action than the medical expenses that might be incurred to treat an actual physical injury caused by such a breach of duty." *Id.* at 101-02.

¶ 76    *Lewis* concluded by stating that, although it had "determined that the trial court erred in concluding that the injury claimed by the plaintiffs was not compensable in a tort action," it was further tasked with determining whether the plaintiffs had pled sufficient facts to satisfy the causation elements of their claims. *Id.* at 102. The court ultimately affirmed the dismissal of counts I and II on the causation issue because the plaintiffs failed to identify which of the defendants manufactured or supplied the lead pigment used in the paint to which their children were exposed. *Id.* at 103-04.

¶ 77    In this case, plaintiffs assert that, because *Lewis* recognized that the expense of a medical examination caused by a defendant's negligence is a present injury compensable in a tort action, the trial court improperly dismissed count I of their first amended complaint for lack of

a present injury. Interestingly, the majority ignores the plaintiffs' argument and finds that plaintiffs sufficiently alleged an injury "due to their consumption of water containing high levels of lead." *Supra* ¶ 34. Although the majority only briefly addresses *Lewis*, I find it necessary to fully address that case based on plaintiffs' heavy reliance thereon. *Lewis* is problematic for numerous reasons.

¶ 78     First and most significantly, I respectfully disagree with *Lewis*'s conclusion that, "[t]here is a fundamental difference between a claim seeking damages for an increased risk of future harm and one that seeks compensation for the cost of medical examinations." *Lewis*, 342 Ill. App. 3d at 101. Such a distinction is not apparent, and I disagree with the following reasoning from *Lewis*:

> "Unlike a claim seeking damages for an increased risk of future harm, a claim seeking damages for the cost of a medical examination is not speculative and the necessity for such an examination is capable of proof within a 'reasonable degree of medical certainty.' " *Id.*

The majority explicitly cites *Lewis* for this proposition but fails to explain how the damages in this case are not speculative. Although I agree that the cost of a single medical examination, as was at issue in *Lewis*, would be easy to ascertain, in this case, plaintiffs' prayer for relief requests "the establishment of a medical monitoring program that includes *** a trust fund, in an amount to be determined, to pay for the medical monitoring of all Class members; and [n]otifying all Class members in writing that they may require frequent medical monitoring necessary to diagnose lead poisoning." That frequent testing may be required, coupled with the plaintiffs' allegation that lead bioaccumulates in the body over time, indicates that plaintiffs are not seeking a one-time-only test. Plaintiffs allege no facts regarding how often, or for what duration, a person would need testing. Thus, the cost of plaintiffs' damages is, in fact, much more speculative than *Lewis* indicated it would be in such a case.

¶ 79     Additionally, the majority ignores that plaintiffs' first amended complaint includes the following five explicit references to an increased risk of harm:

> "2. ***The City has also failed to advise Plaintiffs and the Class of its intention to only partially, rather than fully, replace their lead service pipes at the time of construction and the resulting increased risk of lead exposure over time as a result of the City's work.
>
> 3. As a result of Defendant's negligent and reckless conduct, Plaintiffs, their children, grandchildren, and the Class are at a significantly increased risk of exposure to a known hazardous substance and lead poisoning. ***
>
> * * *
>
> 9. ***As a result of the City's project, Peysin and his family are now at an increased risk for problems associated with ingesting lead.
>
> * * *
>
> 90. As a result of Defendant's negligent and reckless conduct, Plaintiffs, their families, and the Class have been significantly exposed to a known hazardous substance and, consequently, are at an increased risk of lead poisoning. ***
>
> * * *
>
> 103. Defendant's negligence proximately caused Plaintiffs' and the Class members' damages and their increased risk of harm as documented herein."

¶ 80    Based on these allegations, I simply do not see a contrast between a claim seeking medical monitoring damages and a claim for damages for an increased risk of future harm. Additionally, courts at the state and federal level have recognized that "a claim for medical monitoring is essentially 'a claim for future damages.' " See *Bower v. Westinghouse Electric Corp.*, 522 S.E.2d 424, 429-30 (W. Va. 1999) (quoting *Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th Cir. 1991)). I find this view more consistent with principles of Illinois tort law, such as the single-recovery principle and the *Moorman* doctrine, which will be analyzed later in this dissent.

¶ 81    *Lewis*'s reliance on *Friends for All Children, Inc.*, a federal decision from the District of Columbia, is also problematic. The complaint in *Friends for All Children, Inc.* was brought on behalf of numerous Vietnamese orphans who survived an aviation disaster in South Vietnam in 1975 and alleged that, due to both the "decompression of the troop compartment and the crash itself, these survivors suffered, *inter alia*, from a neurological development disorder generically classified as Minimal Brain Dysfunction ('MBD')." 746 F.2d at 818-19. The district court granted partial summary judgment in favor of the plaintiffs, who were children adopted by non-U.S. parents, finding that "approximately forty adopted Vietnamese children living in France faced irreparable injury unless they promptly obtained diagnostic examinations" and granted the plaintiffs' motion for a mandatory preliminary injunction ordering the defendant to create a fund from which the examination costs could be drawn. *Id.* On appeal, the defendant argued that the District of Columbia's tort law had never recognized a cause of action for compensation for diagnostic examinations designed to discover whether a plaintiff has been injured, unless that plaintiff first proved actual physical injury. *Id.* at 824. The court recognized the lack of clarity in tort law in that jurisdiction but predicted that the District of Columbia would allow a plaintiff to maintain an action for diagnostic examinations in the absence of proof that he or she suffered a physical injury. *Id.* at 824-25. The court reasoned that in light of the Restatement (Second) of Torts's definition of " 'injury' "—" 'the invasion of any legally protected interest of another' "—it would be tough to dispute that "an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury." *Id.* at 826 (quoting Restatement (Second) of Torts § 7 (1965)).

¶ 82    In reaching its conclusion, the court in *Friends for All Children, Inc.*, stated as follows:

> "To aid our analysis of whether tort law should encompass a cause of action for diagnostic examinations without proof of actual injury, it is useful to step back from the complex, multi-party setting of the present case and hypothesize a simple, everyday accident involving two individuals, whom we shall identify simply as Smith and Jones:
>
> > Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.
> >
> > From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action." *Id.* at 825.

¶ 83      I find it worthwhile to set forth this hypothetical because it served as the basis of the court's holding in *Friends for All Children, Inc.*, which then served as a basis for *Lewis*. If the above hypothetical was converted to allegations of a complaint, I believe that such a complaint would undoubtedly state a claim for negligence in Illinois. I believe the physical impact of being knocked down by a motorbike and the resulting pain, bruising, bleeding, or other physical symptom, however minor, that would have inevitably occurred are sufficient to constitute a present physical injury, which would allow a plaintiff to recover for medical monitoring damages. Perhaps the question would then become what if the plaintiff did not have any pain, bruising, bleeding, or other physical symptom? It is perplexing why someone who was not in pain, who was not experiencing any physical symptoms, and who did not have any visual physical injury would undergo substantially costly medical examinations. However, even if no outward physical manifestations of injury were apparent, a physical impact has been found to be sufficient to constitute a physical injury in certain circumstances.[5] For example, in claims seeking recovery for negligent infliction of emotional distress, our supreme court has confirmed that "a direct victim's claims for negligent infliction of emotional distress must include an allegation of contemporaneous physical injury *or* impact." (Emphasis added.) *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 38. Thus, I disagree with the logic from *Friends For All Children, Inc.* because Illinois law would allow recovery for medical monitoring damages in the hypothetical the court relied upon to recognize medical monitoring damages as compensable without present physical injury.

¶ 84      Second, *Lewis* is not convincing because its recognition that the cost of medical testing was compensable absent a present, physical injury was premised on the fact that the court there "*[found] no reason why* the expense of such an examination is any less a present injury compensable in a tort action than the medical expenses that might be incurred to treat an actual physical injury caused by such a breach of duty." (Emphasis added.) *Lewis*, 342 Ill. App. 3d at 101-02. It is not clear whether the defendant in *Lewis* raised the same arguments as defendant here, *i.e.*, the applicability of the single-recovery principle, the applicability of the *Moorman* doctrine, and the public policy considerations weighing against allowing recovery without present physical injury.

¶ 85      Third, some confusion exists in *Lewis* as a result of the court's apparent use of the terms "injury" and "damage" interchangeably. In *Lewis*, the court stated that it found "no reason why the expense of such an examination is any less a present *injury* compensable in a tort action than the medical expenses that might be incurred to treat an actual physical injury caused by such a breach of such duty" (emphasis added) (*id.*), but in *Lewis v. NL Industries, Inc.*, 2013 IL App (1st) 122080, a subsequent appeal of the same case, the court referred to its prior decision in *Lewis* as accepting "plaintiffs' theory that the cost of lead testing or assessment could constitute a compensable *damage*" (emphasis added) (*id.* ¶ 2). This is not a distinction without a difference. In setting forth the elements of a cause of action for negligence, injury and damages are often denoted separately. See *Boyd*, 166 Ill. 2d at 194-95. Additionally, it has long been recognized that "[a] legal injury is a wrongful act resulting in damages. As a general

_____

[5]As a brief aside, I, again, note that plaintiffs have not argued that the exposure to lead in their drinking water was a present physical injury sufficient to state a claim. If they had, such an argument would be meritless because our supreme court has already recognized that mere exposure to a harmful substance is not sufficient to constitute a present physical injury. See *Williams*, 228 Ill. 2d at 424-26 (finding that radiation exposure is not a present physical injury).

- 21 -

rule, to constitute a valid cause of action, there must be both injury and damages. An action cannot be maintained for an injury without damage." *Franks v. North Shore Farms, Inc.*, 115 Ill. App. 2d 57, 65 (1969). Thus, I further decline to rely on *Lewis* because confusion exists as a result of the court's initial use of the term "injury" and later use of the term "damage" when referring to the same item.

¶ 86    Fourth, *Lewis*'s holding hinged on a causation issue, not an injury issue as we are faced with here. Based on the foregoing, I reject plaintiffs' reliance on *Lewis*.

¶ 87                              3. Single-Recovery Principle

¶ 88    Further support for my position that plaintiffs were required to plead a present physical (or actual) injury in order to state a claim for medical monitoring damages is apparent when one attempts to rectify plaintiffs' lack of present physical injury with the single-recovery principle. The majority fails to fully address this issue and merely makes the unexplained conclusion that "[t]his court should not find plaintiffs' allegations barred based on what might happen in the future." *Supra* ¶ 39.

¶ 89    In Illinois, we follow the single-recovery principle, which holds that "there may not be more than one recovery of damages for a single, indivisible injury." *Saichek v. Lupa*, 204 Ill. 2d 127, 140 (2003). This means that, when a plaintiff sustains an injury, he cannot divide up his claim and bring successive actions to obtain additional damages. *Id.* This is true " 'regardless of whether or not the plaintiff has recovered all that he or she might have recovered' in the initial proceeding." *Id.* (quoting *Dillon*, 199 Ill. 2d at 502). "This rule is founded on the premise that litigation should have an end and that no person should be unnecessarily harassed with a multiplicity of lawsuits." *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 340 (1996).

¶ 90    Plaintiffs assert that their claims do not implicate the single-recovery principle because the purpose of claim preclusion is to prevent future actions on grounds that could have been raised, not to hinder future actions on grounds that did not yet exist in an earlier action. Plaintiffs do not cite any Illinois case law to support their point and primarily rely on a federal case from Pennsylvania, *Gates v. Rohm & Haas Co.*, 265 F.R.D. 208 (E.D. Pa. 2010), *aff'd*, 655 F.3d 255 (3d Cir. 2011). I decline to rely on *Gates* because in addition to being a federal decision from another state, in that case, the court was tasked with deciding whether to grant class certification and did not decide whether Illinois law applied or what effect the "Illinois so-called single recovery rule" would have if Illinois law did apply. *Id.* at 219.

¶ 91    Instead, I opt to rely on our supreme court's decision in *Dillon*, which, as previously stated, placed express importance on the single-recovery principle. I find that plaintiffs' claim for medical monitoring damages absent a present physical injury is unworkable in light of the single-recovery principle. If plaintiffs were allowed to recover damages for medical monitoring without any physical symptoms, then under the single-recovery principle, they would also have to seek compensation for personal injuries that did not yet (or may never) exist. Until plaintiffs manifested a physical injury, it would be impossible to determine what treatment and corresponding compensation was merited. Additionally, plaintiffs have not cited any binding precedent that supports their contention that the single recovery rule does not prevent future actions on grounds that did not yet exist. As such, I find that the single-recovery principle weighs against recognition of medical monitoring damages absent a present physical

injury.

¶ 93    The majority also fails to fully address this issue and merely finds that, because the plaintiffs' claims are "more in line with tort theory," the *Moorman* doctrine does not apply. *Supra* ¶ 40. Likely, this is because the majority ignores plaintiffs' argument that the cost of medical testing is a present compensable injury. Plaintiffs contend that the *Moorman* doctrine, or economic loss doctrine, has no application here, where their injury does not meet the definition of solely economic damages. "At common law, solely economic losses are generally not recoverable in tort actions." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 198 (1997). In *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 85-86 (1982), our supreme court held that the plaintiff purchaser of a grain storage tank was unable to recover in tort from the manufacturer for solely economic loss based on defects in the tank. The plaintiff had pled theories of liability sounding in strict liability, negligence, and innocent misrepresentation. *Id.* at 72. The court recognized that claims involving "qualitative defects" in products are "best handled by contract, rather than tort." *Id.* at 85-86.

¶ 94    The *Moorman* doctrine was further examined in *In re Chicago Flood Litigation*, a case wherein the plaintiffs (individuals and businesses) brought suit against the City of Chicago and another defendant for negligence, willful and wanton misconduct, and strict liability as a result of massive flooding that occurred in the Chicago Loop, and sought "damages for various alleged losses proximately caused by the flood, including: injury to their property; lost revenues, sales, profits, and good will; lost wages, tips, and commissions; lost inventory; and expenses incurred in obtaining alternate lodging." 176 Ill. 2d at 185-86. The trial court granted the city's motion to dismiss because the *Moorman* doctrine barred recovery for those plaintiffs who only alleged economic loss rather than physical property damage, and the appellate court affirmed for plaintiffs who only alleged an economic loss but did not bar the claims of the plaintiffs who alleged damage in the form of lost inventory due to disruption of utility service. *Id.* at 186-88.

¶ 95    Our supreme court agreed with the trial and appellate courts that "those plaintiffs who did not incur personal injury or property damage may not recover solely economic losses." *Id.* at 201. The court explained that "the tort recovery requirement of injury to person or property is not a 'fortuity,' " (*id.* at 199) because as recognized in *Moorman*, " '[t]ort law [is] "appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence" whereas the remedy for a "loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause *** lies in contract." ' " *Id.* at 200 (quoting *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d 233, 240-41 (1994), quoting *Moorman*, 91 Ill. 2d at 86). The court also rejected the plaintiffs' argument that the flood was a sudden or calamitous event, reasoning that the exception to the *Moorman* doctrine that the plaintiffs sought to invoke was made up of "a sudden, dangerous, or calamitous event coupled with personal injury or property damage" and that the exception would not apply to losses incurred without any personal injury or property damage. *Id.* at 200-01. The court concluded that, "[a]bsent injury to a plaintiff's person or property, a claim presents an economic loss not recoverable in tort." *Id.* at 201.

¶ 96    Here, plaintiffs first argue that the *Moorman* doctrine does not apply because their complaint is not rooted in contractual or commercial expectations. Defendant asserts that

plaintiffs' view of the rule is outdated and was rejected by our supreme court in *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351 (2004). In *Beretta*, the court recognized, "Although the economic loss doctrine is rooted in the theory of freedom of contract, it has grown beyond its original contract-based policy justifications of maintaining the fundamental distinction between contract and tort and protecting the freedom of parties to allocate risk by contract." *Id.* at 422. The court further explained that the plaintiffs had alleged solely economic damages because the damages were based on "costs incurred in the absence of harm to a plaintiff's person or property." *Id.* at 423. I agree with defendant's contentions on this point, and contrary to the majority, I find that merely because plaintiffs' allegations do not arise from a contractual relationship does not preclude the application of the *Moorman* doctrine. In this case, the only loss alleged by plaintiffs in their negligence count is an economic one, *i.e.*, the cost of medical testing and monitoring, and thus *Moorman* applies.

¶ 97      In *Moorman*, the court set forth three exceptions to the economic loss rule that our supreme court has subsequently summarized as follows:

> "(1) where the plaintiff sustained damage, *i.e.*, *personal injury or property damage*, resulting from a sudden or dangerous occurrence [citation]; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud [citation]; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions [citation]." (Emphasis in original.) *In re Chicago Flood Litigation*, 176 Ill. 2d at 199.

Plaintiffs argue that even if the economic loss rule was implicated, then the first exception listed in *Moorman* applies because contamination is a form of property damage that does not constitute a solely economic loss. Defendant responds that no exception applies because any alleged damage was not caused by a sudden, dangerous, or calamitous occurrence. I agree. Although plaintiffs' count II for inverse condemnation seeks compensation for alleged property damage to their service lines, plaintiffs have not alleged they sustained any personal injury. Plaintiffs have not cited, and I have not found, any case where an allegation of property damage in one count was sufficient to recover for personal injury damages in another count where no present physical injury to the plaintiff's person existed. I decline to make such a finding here.

¶ 98      Even assuming *arguendo* that plaintiffs adequately alleged compensable property damage in count I, which they have not, the *Moorman* doctrine would still prevent plaintiffs from stating a claim here because their alleged property damage did not result from a sudden, dangerous, or calamitous event, as is required for the relevant exception to preclude application of the doctrine. Compare *Donovan v. County of Lake*, 2011 IL App (2d) 100390, ¶ 54 (holding that no sudden or calamitous event occurred where the alleged water contamination "manifested itself over a five-year period"), with *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 450 (1989) (recognizing that preventing "recovery in tort merely because the physical harm did not occur suddenly would defeat the underlying purposes of strict products liability"). Neither plaintiffs' opening brief nor their reply provides an explanation or argument as to how the alleged lead contamination resulted from a sudden, dangerous, or calamitous event. Further, plaintiffs' complaint made clear that their allegations stemmed from corrosion that would occur "over time," albeit at a more rapid pace. As such, count I of plaintiffs' complaint seeking purely economic damages for the cost of medical

- 24 -

testing violates the *Moorman* doctrine and does not fall under one of its exceptions.

## 5. Other Policy Considerations

In addition to running afoul of our supreme court's decision in *Williams*, the single-recovery principle, and the *Moorman* doctrine, recognition of medical monitoring damages for plaintiffs' negligence claim absent present physical injury would have various negative policy implications. The United States Supreme Court recognized that allowing such a claim could lead to an essentially limitless pool of plaintiffs because it is widely accepted that "tens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring." *Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 442 (1997). The high number of potential plaintiffs, coupled with the uncertainty as to the amount of liability, could result in a flood of less important cases that would absorb resources that are better left available to those who are more seriously harmed. Defendants do not have access to an unlimited supply of financial resources, and requiring a present physical injury sufficiently quells an influx of litigation that might deplete a defendant's financial resources that are more productively utilized by actually injured plaintiffs. In the same vein, the Supreme Court of Michigan aptly recognized the following:

> "To recognize a medical monitoring cause of action would essentially be to accord carte blanche to any moderately creative lawyer to identify an emission from any business enterprise anywhere, speculate about the adverse health consequences of such an emission, and thereby seek to impose on such business the obligation to pay the medical costs of a segment of the population that has suffered no actual medical harm." *Henry v. Dow Chemical Co.*, 701 N.W.2d 684, 703 (Mich. 2005).

The following reasoning from that case is also sound:

> "The present physical injury requirement establishes a clear standard by which judges can determine which plaintiffs have stated a valid claim, and which plaintiffs have not. In the absence of such a requirement, it will be inevitable that judges *** will be required to answer questions that are more appropriate for a legislative than a judicial body ***." *Id.* at 691.

The foregoing logic from *Henry* comports with our state's view of tort law. Although not recognized by the majority as such, the majority's decision is the first of its kind in this state, and it is pertinent to note that a broad range of holdings from the highest state courts across the country exists.[6] The divergence among the states illustrates that this is an area of law where

___

[6]Many states have rejected medical monitoring damages without present physical injury. See *Caronia v. Philip Morris USA, Inc.*, 5 N.E.3d 11, 18 (N.Y. 2013) (refusing to recognize a judicially created independent cause of action for medical monitoring because allowing such a claim, absent evidence of present physical injury or property damage, would have been "a significant deviation from [New York's] tort jurisprudence"); *Lowe v. Philip Morris USA, Inc.*, 183 P.3d 181, 187 (Or. 2008) (holding that negligent conduct that results only in a significantly increased risk of future injury that requires medical monitoring did not give rise to a claim for negligence); *Paz v. Brush Engineered Materials, Inc.*, 2006-FC-00771-SCT (¶ 5) (Miss. 2007) ("Creating a medical monitoring action would be contrary to Mississippi common law, which does not allow recovery for negligence without showing an identifiable injury ***."); *Henry*, 701 N.W.2d at 692 (rejecting medical monitoring as a separate cause of action and also as a form of damages in a tort action because the only noneconomic injury alleged by the plaintiffs was their fear of future physical injury); *Wood v. Wyeth-Ayerst Laboratories,*

there is neither a majority rule nor discernible trend. Based on my analysis of Illinois jurisprudence, I find that the trial court properly dismissed plaintiffs' count I for negligence based on plaintiffs' failure to allege present physical (or actual) injury to person or property, in addition to damages that result from said injury.

¶ 102                    6. Defendant's Section 2-619 Motion to Dismiss

¶ 103    As a final matter on count I, I take issue with the majority's decision to make advisory[7] rulings on defendant's section 2-619 motion to dismiss. Defendants filed a motion to dismiss pursuant to section 2-619.1 of the Code, which allows combined motions pursuant to section 2-615, section 2-619, and section 2-1005. 735 ILCS 5/2-619.1 (West 2016). Section 2-619.1 does not authorize distinctive claims pursuant to section 2-615, 2-619, or 2-1005 to be commingled. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 20. "Combined motions pursuant to section 2-619.1 retain procedural distinctions between section 2-615, section 2-619, and section 2-1005 based motions, and parties are not free to ignore these distinctions." *Id.* Additionally, a motion to dismiss for failure to state a claim (section 2-615) tests the legal sufficiency of the complaint based on defects apparent on its face (735 ILCS 5/2-615 (West 2016)), whereas a motion to dismiss based on an affirmative matter (section 2-619) admits the legal sufficiency of the complaint, admits all well-pleaded facts and all reasonable inferences therefrom, and asserts that an affirmative matter outside the complaint bars or defeats the causes of action (*id.* § 2-619(a)(9)), such as tort immunity.

¶ 104    Here, the trial court's March 29, 2018, order, granting defendant's motion to dismiss explicitly stated, "In disposing of this motion to dismiss on the narrowest possible grounds, the Court finds it unnecessary to address many of Defendant's arguments and does not reach any of the grounds for dismissal urged under section 2-619." The order also specifically stated that

*Division of American Home Products*, 82 S.W.3d 849, 857 (Ky. 2002) (rejected prospective medical monitoring claim without present injury); *Hinton ex rel. Hinton v. Monsanto Co.*, 813 So. 2d 827, 829 (Ala. 2001) ("Although we acknowledge that other jurisdictions have recognized medical monitoring as a distinct cause of action or as a remedy under other tort causes of action, even in the absence of a present physical injury, we do not and need not know how such jurisdictions coordinated that recognition with the traditional tort-law requirement of a present injury.").

Conversely, some states allow recovery for medical monitoring damages without the plaintiff showing a present, physical injury. See *Sadler v. PacifiCare of Nevada, Inc.*, 340 P.3d 1264, 1270 (Nev. 2014) (holding that "a plaintiff may state a cause of action for negligence with medical monitoring as the remedy without asserting that he or she has suffered a present *physical* injury" (emphasis in original)); *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 719 (Mo. 2007) (*en banc*) (finding that there is no need for proof of a present physical injury in a medical monitoring case); *Simmons v. Pacor, Inc.*, 674 A.2d 232, 239-40 (Pa. 1996) (finding that despite the absence of physical manifestation of any asbestos-related disease, the plaintiffs were able to recover for such regular medical testing and evaluation as is reasonably necessary and consistent with contemporary scientific principles); *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 824 (Cal. 1993) (*en banc*) (holding that "the cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable").

[7]I refer to the majority's conclusion on the section 2-619 motion as "advisory" because it states that "dismissal of plaintiffs' negligence claim pursuant to section 2-619 of the Code *would be* error," implicitly acknowledging that the trial court never ruled on this motion. (Emphasis added.) *Supra* ¶ 45.

- 26 -

defendant's motion to dismiss "pursuant to section 2-615" is granted. Thus, the trial court did not enter a judgment on defendant's section 2-619 motion to dismiss. Despite it being abundantly clear that the trial court did not consider or rule on defendant's section 2-619 motion to dismiss, the majority takes it upon itself to conduct analysis and make a conclusion on the issue.

¶ 105    The majority cites *Brugger v. Joseph Academy, Inc.*, 326 Ill. App. 3d 328 (2001), as support for its consideration of defendant's section 2-619 motion, even though it was not ruled upon by the trial court. In *Brugger*, the trial court granted the defendant's motion for summary judgment "on the grounds that [the defendant] was a 'local public entity' entitled to supervisory immunity for negligence and willful and wanton misconduct under sections 1-206 and 3-108(a) of the Tort Immunity Act." *Id.* at 330. On appeal, the plaintiff asserted that the trial court incorrectly found that the defendant, a private school, was protected under the Tort Immunity Act. *Id.* The defendant argued that the plaintiff waived review of the issue by failing to raise it in the trial court. *Id.* The court stated, "Review of the record indicates that [the plaintiff] raised the argument in the trial court that the Tort Immunity Act did not immunize [the defendant] from liability. Further, a reviewing court may consider an issue where, as here, the issue is one of law and is fully briefed and argued by the parties. [Citations.]" *Id.* at 330-31.

¶ 106    The scenario before this court is not similar to *Brugger*. While it is true that a reviewing court may affirm on any basis in the record, there must first be a judgment entered by the circuit court for us to affirm. *Estate of Powell v. John C. Wunsch, P.C.*, 2013 IL App (1st) 121854, ¶ 32. In *Brugger*, the trial court granted the defendant's summary judgment motion specifically based on the issue of tort immunity. Here, unlike *Brugger*, the circuit court did not enter a judgment on defendant's section 2-619 motion to dismiss based on tort immunity, and thus even though it was briefed by the parties, the majority should not have addressed that issue for the first time on appeal. See, *e.g.*, *City of Chicago v. Latronica Asphalt & Grading, Inc.*, 346 Ill. App. 3d 264, 276-77 (2004) (refusing to address the merits of the defendant's section 2-615 motion to dismiss because "it was never addressed or even ruled on by the trial court in reaching its decision"). Even more troubling is the fact that the majority seemingly decides the contested issue of whether tort immunity applies in the context of an inverse condemnation claim by cursorily stating in a footnote that "even if it did apply, we find that [defendant] has not established this affirmative defense as to plaintiffs' inverse condemnation claim for the same reasons." *Supra* ¶ 47 n.3. Such a conclusion is concerning.

¶ 107                              B. Count II: Inverse Condemnation

¶ 108    I also dissent from the majority's decision that the trial court improperly dismissed count II for inverse condemnation. The majority's decision analyzes a number of cases cited by the parties and concludes that "[t]hese cases do not establish that damages suffered by numerous plaintiffs cannot be 'special damages.' " *Supra* ¶ 53. Although I agree that there is no law that states that inverse condemnation claims brought by numerous plaintiffs are not allowable, I believe the majority has ignored the fact that plaintiffs have failed to allege that they suffered any damages beyond that which would be experienced by a member of the general public whose water main or meter was replaced.

¶ 109    "Property is considered damaged for purposes of the takings clause if there is 'any direct physical disturbance of a right, either public or private, which an owner enjoys in connection with his property; a right which gives the property an additional value; a right which is

disturbed in a way that inflicts a special damage with respect to the property in excess of that sustained by the public generally.' " *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, ¶ 27 (quoting *Citizens Utilities Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 25 Ill. App. 3d 252, 256 (1974)). Our supreme court has also recognized:

> "[I]t has long been established that there are certain injuries, necessarily incident to the ownership of property, which directly impair the value of private property and for which the law does not, and never has, afforded any relief, examples being the depreciation caused by the building of fire houses, police stations, hospitals, cemeteries and the like in close proximity to private property. [Citations.] Such injury is deemed to be *damnum absque injuria*—loss without injury in the legal sense—on the theory that the property owner is compensated for the injury sustained by sharing the general benefits which inure to all from the public improvement." *Belmar Drive-In Theatre Co. v. Illinois State Toll Highway Comm'n*, 34 Ill. 2d 544, 550 (1966).

¶ 110    The trial court dismissed plaintiffs' count II, finding that "the damage to [p]laintiffs is not *special*: it is a damage borne equally by all residents of the City of Chicago attendant to a public improvement, namely the replacement of lead water mains." (Emphasis in original.) I agree with this assessment. In *Rigney v. City of Chicago*, 102 Ill. 64, 81 (1881), our supreme court first recognized that, in order to recover damages in an inverse condemnation action, a plaintiff must show, *inter alia*, that "he has sustained a special damage with respect to his property in excess of that sustained by the public generally." Various cases decided since then illustrate the manner and context in which this language has been applied, though none have addressed a factual scenario identical to the one before us.

¶ 111    In *City of Chicago v. Union Building Ass'n*, 102 Ill. 379, 381, 391 (1882), a building association filed suit against the City, alleging that as a result of City action, a portion of La Salle Street would become impassable as a thoroughfare and thus would cause great damage to the plaintiffs' property, which was located 3½ away. The building association argued that it had an individual interest that was distinct from others because its lot had contributed to the costs of extending and opening La Salle Street, in special assessments made for benefits received. *Id.* at 391. Our supreme court determined that the business association did not suffer special damages, and only sustained damages "of the same *kind* as those sustained by the general public, differing, if at all, only in degree." (Emphasis in original.) *Id.* at 393.

¶ 112    Similarly, in *Parker v. Catholic Bishop of Chicago*, 146 Ill. 158, 168 (1893), our supreme court held that the owner of property adjacent to an alley that was to be permanently closed off did not suffer damages special from that of the general public. The court explained that "special injury, or damages differing in kind from those affecting the general public are the gist of the right of private action." *Id.* The property owner did not suffer special damages because, although she had to go a few feet further to access her property, that was the "same kind of damage that will be sustained by all other persons in the city that might have occasion to go that way." (Internal quotation marks omitted.) *Id.*

¶ 113    Conversely, in *Department of Transportation v. Rasmussen*, 108 Ill. App. 3d 615, 621-22 (1982), the owners of a gas station brought an inverse condemnation claim for damages to their land after access to their property was materially impaired as a result of highway overpass construction, leading to a decrease in the property's value. On appeal, the court rejected the

Department of Transportation's argument that the gas station owners merely experienced the same circuitousness as the general public. *Id.* at 621. The court reasoned that a claimant must show "a direct physical disturbance peculiar to his property; depreciation suffered in common by all lands in the vicinity of an improvement is not compensable." *Id.* Because the construction specifically limited ingress and egress to their property, the gas station owners were entitled to recover. *Id.* at 623-24.

¶ 114    Here, plaintiffs contend that the circuit court's decision to dismiss their inverse condemnation claim was erroneously based on the large number of potential claimants in this action. It is not the number of plaintiffs that is fatal to plaintiffs' claim but rather that plaintiffs Berry and Peysin have allegedly suffered the same kind of damage as one another and the same kind of damage as any other resident with lead service lines, *i.e.*, 80% of the city's population, would suffer if the city replaced a nearby water main. Plaintiffs' count II alleged that, as a result of defendant's water main and meter replacement projects, their services lines are more dangerous because their lead pipes now corrode more aggressively than under normal circumstances. Plaintiffs' complaint sought certification of the following class: "All residents of the City of Chicago who have resided in an area where the City has replaced the water mains or meters (including, but not limited to, those areas defined in attached Exhibit A) between January 1, 2008, and the present." Exhibit A to the complaint does not appear in the record. However, we are aware of the contents of Exhibit A because the trial court's order included a footnote that stated, "Exhibit A to Plaintiffs' First Amended Complaint consists of a 58-page listing of various streets throughout Chicago where work on water mains has occurred since 2009." Plaintiffs' complaint also alleged the following:

> "25. As early as the mid-1800's, public health official and medical journals warned of the dangers of lead to humans and openly questioned the use of lead. By the late-1800's, some states had begun advising 'cities and towns to avoid the use of lead pipes' altogether, as 'there was little doubt in the public health community that lead water pipes were to be avoided.' Consequently many cities had already begun banning their use as of the 1920's, 'conclud[ing] that the engineering advantages of lead were outweighed by the public health risks ***.'

> 26. Chicago did not ban the use of lead in plumbing and public water systems. In fact, Chicago did the opposite; up until the federal ban in 1986, the City actually *required* residents to install lead service lines, even in the face of all the public health warnings over the past century.

> 27. Due to its own building code, the City thus contains 'a legacy of millions' of lead service lines throughout the city and not surprisingly has more than any other U.S. municipality, such that nearly 80 percent of the properties in Chicago receive their drinking water via lead pipes. Unfortunately, these older pipes can corrode, 'result[ing] in the transfer of dissolved or particulate lead into the drinking water.' " (Emphasis in original.)

¶ 115    Plaintiffs' allegations make clear that their alleged damages are not "special." Plaintiffs' damages are of the same kind as their neighbors and 80% of the properties in Chicago, who have lead service lines and are connected to water mains that have been or will need to be replaced. Plaintiffs' complaint also stated that defendant performed water infrastructure projects in more than 1600 areas and that damages allegedly sustained, except as to amount, were common to all members of the putative class. To allege only a difference in degree or

amount of damages is not sufficient; a plaintiff must also allege a difference in kind of damages. See *Metropolitan West Side Elevated R.R. Co. v. Goll*, 100 Ill. App. 323, 332 (1902) ("It is not enough that the damage exceeds merely in amount that sustained by the public generally. It must be greater in kind—that is, greater by reason of its peculiar nature; for if only greater in degree no recovery can be had."). Plaintiffs' count II fails to state a claim because it essentially alleges that plaintiffs and all potential class members have the same kind of damages that vary only in amount. It is perplexing how plaintiffs can argue that their damages were both common and special. Perhaps the inability to rectify these concepts is the reason the parties did not cite, and we did not find, any compensable class action claims for inverse condemnation damages.

¶ 116    If this was not a putative class action alleging commonality, our analysis would still be the same because there is nothing that makes Berry's or Peysin's damages different from the public generally, *i.e.*, their neighbors who are connected to the same water main that defendant replaced, or from all persons who lived in a residence where defendant partially replaced a lead service line or water main. Plaintiffs argue that the public cannot "generally" sustain damage when water main or meter replacement takes place on a specific street, in a specific part of the city, and thus only affects only a few homes. However, this argument ignores that a plaintiff must allege a direct disturbance that was "peculiar" to his property because "depreciation suffered in common by all lands in the vicinity of an improvement is not compensable." See *Rasmussen*, 108 Ill. App. 3d at 621. According to plaintiffs' complaint, anyone who resided in one of the more than 1600 locations where defendant performed a partial lead service line replacement would have experienced the same damages, *i.e.*, pipes that corrode more aggressively and are more dangerous. Thus, plaintiffs' alleged damages are of the same kind as the general public.

¶ 117    Even if I found plaintiffs' damages to be sufficiently "special," which I have not, count II for inverse condemnation was still properly dismissed because the water infrastructure repairs that allegedly caused the damage to plaintiffs' service lines were necessarily incident to property ownership. In *Belmar Drive-In Theatre Co.*, the operator of a drive-in movie theatre brought an action against the highway commission seeking damages based on allegations that bright lights emanating from a toll-road service center made it impossible to show outdoor movies and caused the theatre's business to decline. 34 Ill. 2d at 546. On appeal, our supreme court found that the theatre's claimed injury was based solely on "the exceptionally sensitive and delicate use to which plaintiff devotes its own property" and that such injuries are not compensable. *Id.* at 548-50. The court held that, although the sensitive and delicate nature of the theatre's use of the land was enough to demonstrate the claim's inadequacy, the claim was also deficient because "there are certain injuries, necessarily incident to the ownership of property, which directly impair the value of private property and for which the law does not, and never has, afforded any relief." *Id.* at 550. For example, the depreciation caused by the building of fire houses, police stations, hospitals, and cemeteries in close proximity to private property has never been compensable. *Id.* The court explained, "Such injury is deemed to be *damnum absque injuria*—loss without injury in the legal sense—on the theory that the property owner is compensated for the injury sustained by sharing the general benefits which inure to all from the public improvement." *Id.*

¶ 118    I find that plaintiffs' alleged damages are of a nature that renders them necessarily incident to the ownership of property and thus plaintiffs have failed to state a claim. Plaintiffs'

allegations indicate that their alleged property damage is incident to their ownership of property in Chicago, where the use of lead service lines was mandated until 1986, and defendant has opted to partially replace those lines in thousands of locations throughout the city in order to avoid the consequences from corrosion over time. As previously mentioned, plaintiffs alleged that "nearly 80 percent of the properties in Chicago receive their drinking water via lead pipes." Thus, any alleged damage that resulted from defendant's infrastructure repair or maintenance to its water system would necessarily be incident to property ownership in this city, in the same way that any general benefit received from such repairs, such as the reduction of service interruptions, preventing holes and cracks that could allow bacteria, and preventing wastewater leaks, is also common to all owners. Therefore, I respectfully dissent and would affirm the trial court's dismissal of count II.